MELVIN & A. v. HOITT & A.

A subscription for stock in a railroad corporation is a contract between the subscriber and the corporation.

The validity of a subscription for stock in the Nashua & Rochester Railroad, under special circumstances shown by the evidence in this case, considered.

The authority of a railroad corporation to locate its road, as affected by various special acts in amendment of its charter, and by the General Statutes, considered.

PETITION for a writ of mandamus. The facts are stated in the opinion of the court.

*Morrison, Stanley & Hiland, Bartlett,* and *Hatch,* for the petitioners.

*A. F. Stevens* and *Wm. Barrett,* for defendants.

LADD, J. This is a petition for a writ of mandamus, brought by Thomas J. Melvin and ten others against Alfred Hoitt and fourteen others, whereby the plaintiffs seek to recover from the defendants possession of the records, record books, subscription books, treasurer's records and receipts, and all plans and profiles of survey belonging to the Nashua & Rochester Railroad, and now in the hands of the defendants.

The ground upon which the plaintiffs' claim is based is, that they were duly and legally elected a board of directors of said corporation, at its last annual meeting, held on the 7th day of May, 1872.

The defendants resist this demand, and claim the right to retain the possession of said documents on the ground that they, and not the plaintiffs, were duly and legally elected a board of directors of said corporation at said meeting.

A very large amount of testimony has been taken and laid before us.

The following facts, however, are all we deem it material to state for the proper understanding of our decision :

At a meeting of the grantees of the Nashua & Epping Railroad Company, held at Sanders's hotel, in Derry, on Tuesday, August 11, 1868, the grantees unanimously voted to accept of the act of the New Hampshire legislature of June 24, 1868, uniting the Nashua & Epping Railroad Company with the Portland & Rochester Railroad Company. At this meeting the following resolutions were adopted :

1. *Resolved,* That the several routes, for the purposes hereinafter provided, be respectively designated as follows, viz. : From Nashua to Derry depot by way of Hills Row and the Hudson poor-farm, as the

Hills Row route; from Nashua to Derry depot by the way of the middle of Hudson, as the Hudson route; from Derry depot through Chester, Raymond, Nottingham, &c., to Rochester, as the northern route; from the Mammoth road at West Windham, by way of West Hampstead, Sandown, Epping, Lee, &c., to the intersection with the northern line, as the southern route.

2. *Resolved,* That books be opened for subscriptions to the capital stock of the Nashua & Rochester Railroad upon these several respective routes, and at such other points as subscriptions can be obtained.

3. *Resolved,* That if those who subscribe to such capital so desire, they may designate the route which they prefer.

4. *Resolved,* That whenever such an amount of stock is subscribed as that the present board of managers of the Nashua & Epping Railroad Company shall judge it desirable to organize as stockholders of the corporation of the Nashua & Rochester Railroad, and to locate the road, it shall be the duty of said managers to call a meeting of all the subscribers to stock, and all other parties, if any, actually furnishing capital to construct the road. At the meeting so called, all subscribers to stock or capital shall have a right to cast one vote for each one hundred dollars subscribed, whether the question be upon the election of officers or the location of the road.

5. *Resolved,* That when the road is located, either by officers so elected, or the subscribers to the capital so voting, such subscribers to capital as have signified their preference for either route, if such route shall not have been adopted, may be released from their subscriptions by giving notice to the treasurer, within thirty days from the time of such location, that they desire such release.

*Voted,* That the board of managers of the Nashua & Epping Railroad Company be authorized to act as a board of managers of this corporation, and that they be authorized to carry into effect the resolutions of this meeting.

At a meeting of the board of managers of the Nashua & Rochester Railroad, August 15, 1868, it was *Voted,* To adopt the form of the copy presented by George Y. Sawyer, and have printed twenty books for subscription to stock. *Voted,* That a committee of five be appointed to take charge of the subscription books for stock, and to make suitable and proper arrangements for presenting them to the public for subscriptions, and for procuring subscriptions to the stock of the corporation. *Voted,* That Messrs. Greeley, Melvin, Currier, Parkinson, and Robinson be that committee.

In the form of subscription thus adopted is the following provision : " Subject, however, to the right of withdrawing those subscriptions in which a preferred route is indicated, by notice, in writing, to the treasurer of the corporation within thirty days after the railroad is located, under the authority of the stockholders, in case such location is not upon the route indicated in the subscription as the preferred route.

Books for subscription were opened containing this condition, and signed by the managers.

At a meeting of the subscribers to stock in the Nashua & Rochester Railroad, in pursuance of a call by the managers, held September 1, 1869, a board of nine directors was chosen. On the same day the following vote was passed by the managers: *Voted*, That the corporation, having completed their organization by a choice of directors by the subscribers to stock, at a meeting called by the managers for that purpose, therefore, all the powers and franchises of the corporation under the act of incorporation, and the various statutes passed in reference thereto, be transferred to said subscribers and the board of directors so chosen by them; and the organization of the grantees and board of managers is thereby dissolved.

We do not understand it to be in dispute; but that, from and after that date, the subscribers to stock in the Nashua & Rochester Railroad constituted the corporation, with full power to do all such things as corporations aggregate of the same character may do by the laws of this State.

They did in fact elect directors and a clerk, adopt by-laws, accept various acts of the legislature of New Hampshire, authorize their directors, in pursuance of an act of the legislature, to lease or make such other contract for the use and occupation of their road with any other railroad corporation, upon such terms and for such time as might be deemed expedient and for their best interests. The records show that from September 1, 1869, down to the annual meeting held May 7, 1872, they were a corporation *de facto*, and in the full exercise of all their corporate functions.

Indeed, it is alleged in the petition, and substantially admitted in the answer, that upon the transfer of the franchises of the corporation by the board of managers to the subscribers to stock, the subscribers thereby became and were the sole members of the corporation, and, in their associated capacity, constituted and were the said corporation, and became and were duly organized by the election of a clerk and a board of directors. Before this transfer, subscriptions had been made in the books, signed and issued by the managers as aforesaid, and subscribers had therein indicated their preference as to the route; and such subscribers were, and all along have been, recognized and treated as members of the corporation, and have voted at the meetings. Those books have never been closed or withdrawn by any formal act of the corporation or the directors; and it may be assumed that subscriptions were made on some of them after the transfer of the franchise to the subscribers, which have been recognized and treated as valid by the corporation.

Since the transfer, a large proportion of the subscriptions have been upon a form known as the subscription of 1871, adopted by the corporation, which contains a condition that, before any assessment is made, the road shall be leased to the Worcester & Nashua Railroad Company for a term of not less than twenty years, at a rent amounting to six per cent. per year (payable semi-annually) on the cost of said Nashua & Rochester Railroad Company. And quite an amount of

subscriptions on different books is, upon further conditions, annexed by
the individual subscribers.   For example : several towns make the con-
dition that the railroad shall pass through their towns ; and the Worces-
ter & Nashua Railroad make the condition that the location shall be
established on the lower line, so called, as surveyed by C. O. Davis;
others, that nothing shall be payable by way of assessments until
$1,000,000 shall have been subscribed, &c.

The records show that a special meeting of the corporation was duly
called, to be held on April 5, 1872, to act upon the location of the rail-
road from Nashua to Rochester.   And the books of the corporation
contain the following entry of the doings of the meeting, held in pur-
suance of that call :

Col.  Charles H.  Waters  introduced  the  following resolution, and
moved its adoption :

*Resolved*, That the directors of the Nashua & Rochester Railroad
be, and they are hereby, authorized and directed to locate the route of
said railroad from some point in the city of Nashua, where it shall
connect with the Worcester & Nashua Railroad, to a point in the town
of Rochester, where it shall connect with the Portland & Rochester
Railroad,—said route passing through the towns of Hudson, Windham,
Derry, Hampstead, Sandown, Fremont, Epping, Lee, and Barrington,
being upon the lower route so called, substantially as surveyed by C.
O. Davis, civil engineer—upon the condition, however, that, before said
location shall be made, the contract and lease heretofore executed be-
tween said corporation and the Worcester & Nashua Railroad Com-
pany, for the operation of said Nashua & Rochester Railroad, shall be
modified and changed by the insertion of the following proviso:
And it is further agreed by the said Worcester & Nashua Railroad
Company, that all loss and depreciation occurring or accruing to said
Nashua & Rochester Railroad from the sale of its bonds, notes, or
capital stock, made or issued to construct, complete, improve, repair,
or make additions to said railroad, under the provisions of said lease,
shall be added to and included in the cost of construction, upon
which the interest of six per cent. per year is by the terms of said
lease to be paid, provided the stock or securities so issued shall be
negotiated by the Worcester & Nashua Railroad Company, if they so
elect.

Hon. Thomas J. Melvin, of Chester, moved to amend the resolution
offered by Col. Waters, by striking out all after the word resolved, and
inserting the following :

. *Resolved*, That all action with reference to the location of the Nashua
& Rochester Railroad be postponed until such time as full and accurate
surveys can be made of the several routes contemplated, and profiles
and estimates of the cost of construction of said several routes com-
pleted, so that the subscribers to the capital stock of said company can
act fairly and understandingly.

*Resolved*, That, when the surveys of said several routes, profiles, and
estimates have been made and completed, the president of the

corporation be instructed to call a meeting of the subscribers to the capital stock of the said corporation at the City Hall, in Nashua, by publishing a notice in the Nashua *Telegraph*, agreeably to the provisions of the by-laws of said company, and by printed notices to be sent by mail to each of said subscribers.

After discussion of the subject, the question was put upon the adoption of the amendment proposed by Mr. Melvin, and it was decided in the negative, and the amendment was rejected.

The question then recurred upon the adoption of the original resolution as proposed by Col. Waters,—and being put, it was decided in the affirmative, and it was adopted unanimously. The answer, however, alleges, and the proof shows, that during the progress of this meeting an injunction was served restraining the corporation, its officers, &c., from locating the road. The record is, therefore, of no consequence, except as it tends to show, in connection with the other evidence in the case, that a large majority of those who had subscribed for stock at that ·time were in favor of the lower or southern route; and that efforts were being made by those in favor of the northern or Hills Row route to prevent the location on the line preferred by the majority. About two or three weeks after the meeting of April 5—that is, about one or two weeks before the annual meeting of the corporation, which took place May 7, 1872—a subscription book was drawn up, spoken of by the witnesses as the "Mellen book." All the facts in relation to this book do not appear so fully perhaps as might be desirable. It does appear, however, that it was procured to be made by Mr. Scripture, one of the directors, and that perhaps one or two others of the directors were cognizant of it at the time, and countenanced its issue, although that is not made very clear by the evidence. But it was never authorized or directed by the corporation, or by the directors as a board, and but four or five at most out of the fifteen directors appear to have known of its existence until it was produced at the annual meeting of May 7.

The substance of this subscription does not differ materially from that authorized and signed by the managers in the books issued under the resolution of August 11, 1868, except that it contains a provision that interest shall be allowed on each assessment from the time of its payment until the road is completed, at the rate of six per cent. per annum, which is taken substantially from the conditional subscription of 1871. The wording of the document is wholly different throughout from the managers' subscription.

This Mellen book, a few days—perhaps a week or two—before the annual meeting, came to the hands of Col. George W. Lane, an active and zealous friend of the northern route, but not a director of the corporation, who, between that time and the day of the meeting, signed it himself for 1,000 shares, and procured subscriptions from six other persons, amounting in the whole to 7,500 shares, all signifying their preference for the Hills Row or northern route. These subscriptions were not made known to the officers of the corporation having charge

of the books, and were not entered upon the records of the corporation ; but the subscribers appeared at the annual meeting and claimed the right to vote upon them, and did in fact cast ballots representing 7,500 shares of stock for directors. If these ballots had been received and counted, the plaintiffs would have been elected directors. They were rejected, and a very large majority of the remaining votes being for the defendants, the record shows that they were declared elected. The vote, as reported to the meeting by the committee appointed to assort and count it, stood for the plaintiffs 1,464, and for all the defendants, except Hoitt, Kinnicutt, and Turner, 6,685. Hoitt had 8,149 ; Kinnicutt and Turner, 8,159 each. If the votes cast upon the Mellen subscription had been counted, the plaintiffs would have received 8,964 each.

At the time of the meeting of April 5, 1872, there had been made known to the treasurer of the corporation, and entered upon his books, subscriptions for 8,820 shares. Four other subscription books, previously issued by authority of the corporation, were presented, containing 1,904 shares,—namely, the books of the towns of Chester, Derry, Deerfield, and Nottingham. Some of these subscriptions were made before, and some after April 5 ; but the evidence does not show how much before and how much after. By an act of the legislature, passed at the June session, 1871, the capital stock of the Nashua & Rochester Railroad was limited to 15,000 shares, and authority was given to the president and directors, for the time being, to fix the amount from time to time. The evidence, therefore, makes it quite certain that the Mellen subscription, at the time it was procured, increased the capital stock 1,500 shares above the amount limited by the legislature, and leaves it very probable, to say the least, that it made the excess 1,000 shares more than that,—that is, 2,500 shares in all. It is claimed by the defendants that the directors, on May 5, 1872, in pursuance of the authority given them by the act of June 30, 1871, limited the stock to 10,000 shares.

It is alleged in an amendment to the petition that they did at that time undertake and pretend to limit the capital stock of said corporation to 10,000 shares of $100 each, or $1,000,000 ; and it is averred that such pretended limitation was not made in good faith, but was made for the corrupt and fraudulent purpose of excluding further subscriptions, authorized, &c., and keeping the control and location of said railroad within their own power. The fact of limitation is also alleged in the answer, the fraud being denied. The question thus presented is the good faith of the limitation. In the view we have taken of the case, we have not found it necessary to go into that question ; and our decision does not rest at all upon any limitation of the capital stock by the directors.

Many other matters have been laid before us in the evidence, but this is enough to show the grounds upon which our judgment is based.

Upon these facts, it is claimed by the plaintiffs that the subscribers

on the Mellen book were members of the corporation on May 7, 1872, and were entitled to vote for directors; that their votes were wrongfully and illegally rejected; and that the plaintiffs were by their votes legally elected directors of the corporation.

The question is, Were the subscribers on the Mellen book members of the corporation, May 7, 1872? We think they were not.

Chapter 133 of the General Statutes relates to the general powers of corporations, excepting only public municipal corporations. Section 3 provides that every such corporation may admit associates and members, and for just cause remove them. It need not be said that the power to admit associates and members beyond all question implies the power to reject or refuse admission to those who may seek to become members, at the will of the corporation.

The subscription is a contract to which the subscriber and the corporation are the parties—Ang. & A. on Corp., sec. 517—and such contract cannot be consummated without the assent of both. *Lechmere Bank* v. *Boynton*, at p. 380; *Essex Turnpike Corp.* v. *Collins*, 8 Mass. 292; *Company* v. *Balch*, 8 Gray 311; *Penobscot Boom Corp.* v. *Lamson*, 4 Shep. 224; *Day* v. *Stetson*, 8 Greenl. 365. The doctrine has been repeatedly recognized in this State;—see *Low* v. *The C. & P. R. Railroad*, 45 N. H. 370; *Chesley* v. *Pierce*, 32 N. H., at p. 402; *Hughes* v. *Parker*, 20 N. H. 58.

It is contended by the plaintiffs that the Mellen book was in effect the same as the managers' books issued Aug. 15, 1868; that the terms of subscription offered by those books were adopted, ratified, and continued by the corporation when the franchise passed into the hands of the subscribers; that they were in force as a valid offer of terms upon which stock might be taken, when the Mellen subscriptions were made, and that, therefore, when those terms were accepted, a valid contract was completed with the subscribers, whereby not only the corporation became bound to admit them as members, but by force of which they actually became and were members.

It might, perhaps, be well enough objected to this that the Mellen book was not in fact one of the subscription books issued by the managers; and further, that the terms of the subscription being different in at least one somewhat essential particular, the contract sought to be enforced is one which was never offered or assented to by the managers on behalf of the corporation. But we are inclined to put our decision on broader ground. It is very manifest from the evidence that the managers' subscription of 1868 had been substantially abandoned. It must have been well known to Col. Scripture, as well as to all the directors and others actively interested in advancing the enterprise, that it was in contemplation to lease the road to the Worcester & Nashua Railroad, according to the authority granted for that purpose by the act of June 30, 1871. Indeed, at a meeting of the corporation held August 24, 1871, it was voted that, for the purpose of encouraging subscriptions to the capital stock of said railroad and insuring its early construction, the board of directors are hereby authorized to lease, &c.,

their road, upon such terms and for such time as may be deemed expedient, &c.

The evidence leaves no doubt but that a form of subscription was thereupon drawn up and circulated among the members, and approved by them, containing a condition that the road should be leased, &c. ; that by sufficient authority *de facto*, derived from the corporation at that meeting, the papers known as the conditional subscription of 1871 were immediately afterwards printed and offered for signature ; that a large amount of subscriptions which had been made upon the managers' books was transferred to this new subscription, and that thereafterwards very nearly all subscriptions, amounting in the aggregate to several thousand shares, were made upon this form.

Col. Scripture himself entered the new form in his book at Nashua, procured many of the former subscriptions to be transferred and entered under it, and thereafter obtained new subscriptions upon that condition instead of the old one.

We think all this sufficiently indicated the purpose of the corporation to adopt a new basis of subscription, entirely different from and inconsistent with that of the managers ; and that after this no director, with knowledge of the new form the enterprise had assumed, would be at liberty to authorize or encourage subscriptions upon the old form, with a view to thwart the wishes and intention of the corporation thus clearly expressed. At all events, we have no doubt but that the corporation would have the legal right and power under these circumstances to refuse to receive as members those whose subscriptions for stock had been thus obtained. We think Col. Scripture, and the other individual directors (if there were any) acting in concert with him in procuring the Mellen book to be drawn up, had no legal power to bind the corporation to the contract of subscription offered by it; that when that book was signed by parties who promised to take and pay for stock upon the terms and conditions therein set down, no valid contract was thereby created between them and the corporation ; that the corporation did not in and by said book agree to accept them as members ; that, therefore, they were not members on the day of the annual meeting, and their votes were rightly rejected.

It is contended on the part of the petitioners, that, setting aside the vote upon the Mellen subscriptions, they still had a majority of the legal votes cast for directors, on the ground that nearly all the votes against them were unauthorized and illegal.

Aside from the Mellen subscriptions, the plaintiffs received 1,464 votes upon shares which were duly entered on the treasurer's books and treated by the corporation as legal.

An examination and analysis of all those votes would, doubtless, be a very tedious and difficult task ; and we might, perhaps, content ourselves with saying simply that the evidence shows that the votes for the defendants were cast upon subscriptions which had all along been treated by the corporation as valid ; had been acquiesced in by some at least of these plaintiffs, and never disputed or challenged by any-

body, and were duly entered upon the treasurer's books as required by sec. 10 of ch. 134, Gen. Stats.

We have, however, examined some of the subscriptions upon which the votes for the defendants were cast, and are entirely satisfied that, applying to them, where applicable, the same rules that must be adopted to save the votes cast for the plaintiffs, a large proportion—perhaps all of them—were properly received and counted,—certainly enough to overbalance the 1,464 cast for the plaintiffs. To take a single instance, which may be sufficient to dispose of the case, we think this is true of the Nashua vote. The city of Nashua subscribed for 2,000 shares in 1869, as shown by the joint resolution of the mayor and aldermen and common council of May 14, 1869. This subscription was upon the managers' book. Certain additional conditions were annexed by the city, as is true of the subscriptions of most towns: for example, that no assessment should be made until $1,000,000 was subscribed to the stock; that assessments should be made only so fast as the road is built, mile by mile, 1-46th part of the subscription to be payable on the completion of each mile;—but these conditions were acquiesced in by the corporation, and the city was accepted as a member of the corporation.

On March 23, 1872, the conditions of the resolution of 1869 were rescinded, the recision to take effect upon the execution of a lease of the road to the Worcester & Nashua Railroad, thus bringing their subscription to the terms of the conditional subscription of 1871. We are unable to perceive any objection to this. Undoubtedly the corporation might have declined the subscription upon the terms offered; but they did not do so. The subscription was accepted; was entered upon the treasurer's book; was represented and voted upon at the meetings without objection;—and we think that the votes were properly received. No proof has been laid before us tending to show that the subscription made by the mayor on behalf of the city, in accordance with the resolution of the aldermen and common council, was unauthorized; and if such a claim is to be made by the petitioners, it is incumbent on them to show it.

But it is said, as we understand the position of the plaintiffs, that the subscription of Nashua being, as it now stands, upon condition of a lease to the Worcester & Nashua Railroad, it is subject to the further condition that the road shall be located on the southern route; that the southern route is without the limits of the charter; and that, therefore, the condition is illegal, and the subscription for that cause invalid. We have accordingly examined the question of the right of the Nashua & Rochester corporation to locate their road, that question having been argued by counsel, and submitted to our determination at this time.

All railroad corporations are declared by statute in this State to be public—Gen. Stats., ch. 146, sec. 2; and the roads themselves are public, and at all times subject to the control of the legislature. The mode in which they shall be located and laid out has always been regulated and established by the legislature.

By Gen. Stats., ch. 146, secs. 4, 5, and 6, the power to locate their road is conferred, in the first instance, upon the proprietors and their agents. There can be no doubt but that under this general provision the Nashua & Rochester corporation had authority, without the intervention of the railroad commissioners, to locate and lay out their road. Indeed, since the enactment of the General Statutes there seems to have been no provision whereby the railroad commissioners could legally make a location in the first instance,—their powers in this respect being limited to cases where stockholders holding one tenth of the capital stock are dissatisfied with the location made by the corporation—Gen. Stats., ch. 146, sec. 8—and where a change of the location is desired—sec. 18, same chapter.

The only question then is, whether there is anything in the charter of the Nashua & Rochester Railroad, as it now stands, amended by the great number of special acts in relation thereto passed since the original charter was granted to the Nashua & Epping Railroad in 1848, by which the location of the road is confined to any particular route, or to any particular intermediate point between Nashua and Rochester. We have carefully examined those various acts, which are of the following dates: Dec. 29, 1848; June 30, 1853; July 2, 1853; July 2, 1866; July 5, 1867; June 24, 1868; June 30, 1871.

By the act of July 2, 1866, it was left for the railroad commissioners to lay out the Portland & Rochester Railroad from Rochester to Manchester, or to the Concord & Portsmouth Railroad, at any intermediate point on said railroad, thereby connecting with Manchester, without any other restrictions as to the route; and so far as that part of the route is concerned, there is no question, as we understand it, growing out of any act of the legislature affecting the corporate rights of that road, because we have no doubt but that any special provision as to a location by the commissioners must be regarded as repealed by the broad provision of the General Statutes covering the subject.

The original charter of the Nashua & Epping Railroad confined the location to certain towns. But it is clear, we think, that the act of 1853, whereby it was provided that the Nashua & Epping Railroad might be constructed, between Nashua & Epping, through such towns as the railroad commissioners might determine, anything in the original act to the contrary notwithstanding, places this part of the route upon the same footing, as to all restrictions except Epping, with the other; that is, except as to Epping, the location is left to be fixed by the commissioners. But it appears to be sufficiently plain that the restriction as to Epping has been removed by the acts of the legislature, passed since that time. By act of July 5, 1867, the Portland & Rochester and the Nashua & Epping railroads were authorized to unite; and by act of June 24, 1868, those two corporations were united into one corporation by the name of the Nashua & Rochester Railroad. No agreement for the union was approved and filed under the provisions of the act of 1867. In that act, sec. 6, it was expressly provided that in case no such agreement were approved and filed, "the said Nashua

& Epping Railroad Company may construct their railroad from Nashua to the Portsmouth & Concord Railroad, or to such other point as may be necessary and convenient for forming a connection with said railroad of the Portland & Rochester Railroad Company, and constituting a continuous railroad route from Nashua to Rochester." This clearly abrogates all restrictions before that time existing as to the location of their road by the Nashua & Epping company, including, of course, the restriction as to the town of Epping. It is probably unnecessary, after all, to show this, as we understand the southern route passes through Epping.

The subsequent legislation shows that no forfeiture of the rights conferred by the acts referred to has taken place through a failure of the several corporations to perform the conditions imposed; that is, the time within which it was provided that $100,000 must be expended in construction has been extended by the legislature so that the rights have been preserved.

Our conclusion upon this part of the case therefore is, that so far as it may appear from any or all the special acts that the location was to be fixed by the railroad commissioners, the force and operation of those acts are arrested, and the acts themselves are in effect repealed, by the provisions of the General Statutes relating to the same subject; and so far as the restrictions as to location, contained in the original charter of the Nashua & Epping Railroad, are concerned, they are all repealed by the subsequent special legislation on the subject. So that the Nashua & Rochester Railroad, ever since the act of June 24, 1868, uniting the Nashua & Epping and the Portland & Rochester corporations, has had the legal right to locate its road according to the provisions of the General Statutes.

We think, therefore, that the subscription of the city of Nashua was not invalid for this reason, and that their vote was properly received. That vote was 2,000—sufficient to make a majority for the defendants.

The result is, that the petitioners fail to show that they were legally elected directors at the annual meeting of May 7, 1872, and the

*Petition must be dismissed.*